ALISON J. NOHARA and PATTI J. SZYDEL, individually, and as representatives of a Class of Participants and Beneficiaries of the Prevea Clinic, Inc. 401(k) and Retirement Plan,

Plaintiffs,

v.

PREVEA CLINIC, INC.,

and

THE BOARD OF DIRECTORS OF PREVEA CLINIC, INC.,

Defendants

Case No. 1:20-cv-1079-WCG

**CLASS ACTION THIRD AMENDED COMPLAINT FOR CLAIMS UNDER 29 U.S.C. § 1132(a)(2)**

## THIRD AMENDED COMPLAINT

COMES NOW Plaintiffs, Alison J. Nohara and Patti J. Szydel, individually and as representatives of a Class of Participants and Beneficiaries of the Prevea Clinic, Inc. 401(k) and Retirement Plan (the "Plan"), by their counsel, WALCHESKE & LUZI, LLC, as and for a claim against Defendants, alleges and asserts to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1. Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill,

prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

2.      The ERISA fiduciary duty of prudence governs the conduct of plan fiduciaries and imposes on them "the highest duty known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982.)

3.      The law is settled under ERISA that, "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739 (2022), and "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* (*citing Tibble v. Edison Int'l*, 575 U.S. 523 (2015)).

4.      Even in a defined contribution plan in which participants are responsible for selecting their plan investments, *see* ERISA Section 404(c), 29 U.S.C. § 1104(c), "plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *See Hughes*, 142 S. Ct. at 742 (*citing Tibble*, 575 U.S. at 529–530). "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time," fiduciaries "breach their duty [of prudence]." *Id.* Imprudent investments, as that term is used herein and by the United States Supreme Court, includes services provided by Plan recordkeepers. *See Hughes*, 142 S. Ct. at 742.

5.     Defendants, Prevea Clinic, Inc. ("Prevea Clinic") and the Board of Directors of Prevea Clinic, Inc. (collectively "Defendants"), are ERISA fiduciaries as they exercise discretionary oversight, authority, or control over the 401(k) defined contribution pension plan – known as the known as the Prevea Clinic, Inc. 401(k) and Retirement (the "Plan" or "Prevea Plan") – that it sponsors and provides to its employees.

6.     During the putative Class Period (July 20, 2014 through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to "pay excessive recordkeeping [and administrative (RKA)] fees." *Hughes,*142 S. Ct. at 739-740, and by failing to timely remove their high-cost and long-time recordkeeper, Transamerica Retirement Solutions LLC ("Transamerica").

7.     These objectively unreasonable RKA fees cannot be contextually justified and do not fall within "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *See Hughes*, 142 S. Ct. at 742.

8.     Defendants breached their fiduciary duty of prudence by causing the Plan participants to pay excessive RKA fees. Defendants unreasonably failed to leverage the size of the Plan to pay reasonable fees for Plan RKA services.

9.     ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating RKA fees based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

10.     There is no requirement to allege the actual inappropriate fiduciary actions taken because "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead

details to which he has no access, as long as the facts alleged tell a plausible story." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016).

11.     The unreasonable RKA fees paid inferentially tells the plausible story that Defendants breached their fiduciary duty of prudence under ERISA.

12.     These breaches of fiduciary duty caused Plaintiffs and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees and expenses.

13.     To remedy these fiduciary breaches, Plaintiffs bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches of the duty of prudence.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*

15.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

16.     Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

17.     In conformity with 29 U.S.C. § 1132(h), Plaintiff served the original Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

18.     Plaintiff, Alison J. Nohara, is a resident of the State of Wisconsin and currently resides in Green Bay, Wisconsin, and during the Class Period, was a participant in the Plan under 29 U.S.C. § 1002(7).

19.     Plaintiff Nohara works as a neuro-interventional radiologist at Prevea, she was hired in September 2018, and she is assigned to work at HSHS St. Vincent Hospital in Green Bay. Her employment continues to the present.

20.     Plaintiff Nohara is a current participant in the Plan and paid excessive RKA fees during the Class Period through her investments in the T. Rowe Price Retirement 2035 Fund.

21.     Plaintiff Szydel is a resident of the State of Wisconsin and currently resides in Kewaunee, Wisconsin, and during the Class Period, was a participant in the Plan under 29 U.S.C. § 1002(7).

22.     Plaintiff Szydel worked as an Employee Health Nurse at Prevea Clinic, she was hired in August 2002, and she was assigned to work at Prevea East Mason Health Center in Green Bay. Plaintiff Szydel's employment with Prevea Clinic was terminated on March 1, 2020.

23.     Plaintiff Szydel is a current participant in the Plan and paid excessive RKA fees during the Class Period through her investments in Manning & Napier Blended Fund, T. Rowe Price Retirement Balanced Bonds, Dodge & Cox Income, Vanguard Short-Term Investment-Grade I Stocks, AllianzGI NFJ Small-Cap Value lnstl., American Funds EuroPacific Gr R5, American Funds Growth Fund of Amer R5, American Funds Growth Fund

of America R5E, Vanguard Institutional Index I, Vanguard Small Cap Growth Index I, Wells Fargo Special Small Cap Value A and T. Rowe Price Retirement 2030 Fund.

24. Plaintiffs have Article III standing as a current Plan participants to bring this action on behalf of the Plan because they suffered actual injuries to their own Plan accounts through paying excessive RKA fees to Transamerica during the Class Period, that injury is fairly traceable to Defendants' unlawful conduct in maintaining Transamerica as its record-keeper during the Class Period, and the harm is likely to be redressed by a favorable judgment providing equitable relief to the Plaintiffs and Class.

25. Having established Article III standing, Plaintiffs may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond their own injuries.

26. The Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive RKA fees) necessary to understand that Defendants breached their fiduciary duty of prudence until shortly before this suit was filed.

27. Having never managed a near-mega 401(k) Plan, meaning a plan with over pr close to $500 million dollars in assets, *see Center for Retirement and Policy Studies, Retirement Plan Landscape Report* 18 (March 2022) ("Mega plans have more than $500 million in assets,")[1] Plaintiffs, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

---

[1] Although the 2021 5500 Form reports that the Prevea Plan has some $461 million in assets at the end of 2021, there is little doubt that the Plan will have more than $500 million in assets by the end of 2022.

28.     Prevea Clinic, Inc. ("Prevea") was founded in Green Bay, Wisconsin in 1996, and it is a health care organization that provides primary and specialty health care in more than eighty (80) physical locations that it owns, operates, and manages across Northern, Eastern (including but not limited to in Sheboygan, Wisconsin), and Western Wisconsin in clinic and hospital settings, along with onsite and near-site locations in coordination with its Corporate Health and Wellness services. Its principal headquarters are located at 2710 Executive Drive, Green Bay, Wisconsin 54303. In this Complaint, "Prevea Clinic" refers to the named defendant and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

29.     Prevea acted through its officers, including the Board Defendants, to perform Plan-related fiduciary functions in the course and scope of their business. Prevea appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees, and remove them for poor performance. For these reasons, Prevea is a fiduciary of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

30.     Prevea is both the Plan Sponsor and the Plan Administrator of the Prevea 401(k) and Retirement Plan. As the Plan Administrator, Prevea is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). It has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a). Prevea has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

31.     The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that Prevea's contributions to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

32.     In 2021, the Plan had about $461,229,928 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had substantial bargaining power regarding Plan fees and expenses. Defendants, however, did not regularly monitor Transamerica, to ensure that it remained the prudent and objectively reasonable choices as Plan service provider.

33.     With 2,646 participants in 2021, the Plan had more participants than 99.41% of the defined contribution Plans in the United States that filed 5500 forms for the 2021 Plan year. Similarly, with $461,229,928 in assets in 2021, the Plan had more assets than 99.64% of the defined contribution Plans in the United States that filed 5500 forms for the 2021 Plan year.

## ERISA'S FIDUCIARY STANDARDS IN THE
## DEFINED CONTRIBUTION INDUSTRY

34.     Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. An employer may also make matching contribution based on an employee's elective deferrals.

35.     Employees with money in a plan are referred to as "participants" under ERISA Section 3(7), 29 U.S.C. § 1002(7).

36.     Although Prevea contributed employer matching contributions to Plan partic-
ipants during the Class Period, these matching contributions are irrelevant to whether a
Plan has paid excessive plan recordkeeping fees or other types of Plan expenses.

37.     While contributions to a plan account and the earnings on investments will
increase retirement income, fees and expenses paid by the plan may substantially reduce
retirement income. Fees and expenses are a significant factor that affect plan participant's
investment returns and impact their retirement income.

38.     According to the United States Department of Labor, Employers must: (1) es-
tablish a prudent process for selecting investment options and service providers; (2) ensure
that fees paid to service providers and other plan expenses are reasonable in light of the
level and quality of services provided; and (3) monitor investment options and service pro-
viders once selected to make sure they continue to be appropriate choices. *See* United States
Department of Labor, Employee Benefit Security Administration, *Meeting Your Fiduciary
Responsibilities*, 12 at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activi-
ties/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf (last visited
Aug. 11, 2022) (hereinafter "DOL Fiduciary Publication") ("If you are hiring third-party ser-
vice providers, have you looked at a number of providers, given each potential provider the
same information, and considered whether the fees are reasonable for the services pro-
vided?").

## Recordkeeping and Administrative (RKA) Services

39.     Defined contribution plan fiduciaries of mega 401(k) plans hire service provid-
ers to deliver a retirement plan benefit to their employees. There is a group of national

retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of mega retirement plans with the same level and caliber of services. Transamerica is one such recordkeeper.

40.     These recordkeepers deliver all the essential recordkeeping and related administrative ("RKA") services through standard bundled offerings of the same level and quality as other recordkeepers who service mega plans.

41.     The fees charged by recordkeepers for RKA services are impacted by 1) the costs of providing the RKA services; 2) the competitive environment related to what other recordkeepers would charge to provide materially identical services; and 3) the revenues that a recordkeeper can generate from both the recordkeeping fees as well as other ancillary revenue based on the potential to manage proprietary investment options in the plan.

42.     Providing RKA services involves both fixed and variable costs.  The more participants in a plan, the greater proportion of the costs are variable costs which, in turn, means the closer the average cost per participant approaches the variable cost per participant.

43.     All else being equal, the more participants a plan has, a recordkeeper will be able to provide a lower fee per participant to provide identical RKA services to maintain the same profit margin rate.

44.     As a result, it is axiomatic in the retirement plan services industry that the more participants in a plan, the lower the effective RKA fee per participant the plan can

negotiate. All prudent plan fiduciaries and their consultants and advisors are aware of this industry dynamic.

45. There are two types of essential RKA services provided by all recordkeepers. The first type, "Bundled RKA" services, include:

a. Recordkeeping;

b. Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c. Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

d. Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e. Maintenance of an employer stock fund;

f. Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g. Plan consulting services including assistance in selecting the investments offered to participants;

h. Accounting and audit services including the preparation of annual reports, e.g., Form 5500;

i. Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan;

j. Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules; and

       k.      Trustee / custodian services.

46.    According to the 2020 Plan Participant Fee Disclosure under ERISA Section 404(a)(5), the plan's RKA fees include "general administrative fees for plan services (e.g., legal, accounting, auditing, recordkeeping) [which] may from time to time be deducted as a fixed dollar amount from your account."

47.    The second type of essential RKA services, hereafter referred to as "A La Carte services," provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees). These "A La Carte RKA" services typically include the following:

       a.      Loan processing;

       b.      Brokerage services/account maintenance;

       c.      Distribution services; and

       d.      Processing of Qualified Domestic Relations Orders (QDROs).

48.    The 2020 Plan Participant Fee Disclosure under ERISA Section 404(a)(5) provides for all such standard A La Carte services, like all other similar mega 401(k) plans.

49.    The sum of the total Bundled RKA fees plus the total A La Carte RKA fees equals the "Total RKA fees."

50.    In practice, there are no material difference between the services that are offered and provided by national recordkeepers, like Transamerica. Rather, some recordkeepers may differ in *how* they deliver the services.

51.    As an example, because the RKA offering are materially identical among all recordkeepers who provide services to mega plans, like the Prevea Plan, it is the standard

and prevailing practice for retirement plan consultants and advisors (experts in the retirement plan industry) to request quotes by asking what the recordkeeper's revenue requirement is on a per participant basis for providing the Bundled RKA services.

52.     Similarly, in most cases differences in fee rates for the A La Carte services are immaterial in determining the total fees charged by recordkeepers.  To the extent that some recordkeepers have charged higher fees for these services, when those recordkeepers are in a competitive situation (in which they may not win the business), they will reduce their A La Carte fee rates to be competitive with what others are charging.

53.     The same is true for the Bundled RKA fee rates charged by recordkeepers. Retirement plan consultant and advisors primarily use the Bundled RKA fee rate of different recordkeepers to make fee rate comparisons and determine whether the Bundled RKA fee rate is reasonable.

54.     This approach is validated by the structure of the request for proposals ("RFPs") sent out by retirement plan consultants and advisors and the responses provided by the recordkeepers and then the summary of the evaluations created by the retirement plan consultants and advisors.

55.     For mega plans, like the Prevea Plan, any immaterial variations in the way certain services are received by one plan compared to another plan have an immaterial impact on the reasonable market rate for Bundled RKA services.

56.     As a result, comparisons of the fees paid by similar sized plans are meaningful and provide a reasonable basis for determining whether an inference of imprudence is warranted based on the RKA fees being paid by any specific plan.

57. Additionally, any minor variation in the level and quality of Bundled RKA services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers.

58. Since well before 2015, industry experts have maintained that for mega retirement plans like the Prevea Plan, prudent fiduciaries treat Bundled RKA services as a commodity with little variation in price: "Custody and recordkeeping are 'commodity' services. Like any commodity, given equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015).

59. Industry experts know that recordkeeping services have become a commodity for retirement plan fiduciaries; virtually every major recordkeeper provide the same core services. See, e.g., Allen Steinberg, *Unchecked Revenue: Show Me the Fees*, https://blog.retireaware.com/2018/01/12/unchecked-revenue/ (last visited Sep. 15, 2022); Fred Barstein, Investment News, *Potential Pru Retirement Sale a Cautionary Tale of a 401(k) Innovator*, https://www.investmentnews.com/prudential-retirement-sale-cautionary-tale-innovatio-205453 (Apr. 20, 2021) ("It is no wonder, but certainly disappointing, that one of the industry's most innovative providers, Prudential Retirement, is reportedly exploring a sale. That highlights how much record keeping has become a commodity focused on scale and costs.").

60. Fidelity, the largest 401k recordkeeper in the country, has conceded that the RKA services that it provides to mega Plans, are commodified.

61. As part of stipulated facts in a materially identical ERISA plan fees case, Fidelity stated: "The value of the recordkeeping services that Transamerica provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Transamerica provided to the Plan in 2015 and 2016 was $17 per participant, per year, and the value of the recordkeeping services that Transamerica has provided to the Plan since January 1, 2017 is $14 per participant, per year. *Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Transamerica it could have obtained recordkeeping services for these amounts during these periods. The Plan did not receive any broader or more valuable recordkeeping services from Transamerica than the services received by any other Transamerica-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).*" See *Moitoso v. FMR LLC, et al.*, 1:18-CV-12122-WGY, Stipulation of Facts, Dkt. 128-67, at 4-5 (D. Mass. Sep. 6, 2019) (emphasis added).

62. All recordkeepers quote fees for the Bundled RKA services on a per participant basis without regard for any individual differences in services requested, which are treated by the recordkeepers as immaterial because they are inconsequential from a cost perspective to the delivery of the Bundled RKA services.

63. Because dozens of recordkeepers can provide the complete suite of required RKA services, plan fiduciaries can ensure that the services offered by each specific recordkeeper are apples-to-apples comparisons.

64.     Plan fiduciaries use the Bundled RKA fee rate as the best and most meaningful way to make apples-to-apples comparisons of the recordkeeping fee rates proposed by recordkeepers.

65.     As demonstrated by its 2020 Participant Fee Disclosure and its 5500 Forms, the Prevea Plan had a standard level and quality of Bundled RKA services, providing RKA services of a nearly identical level and quality to other recordkeepers who also serviced mega plans during the Class Period.

66.     There is nothing disclosed in the Plan participant fee disclosures under ERISA Section 404(a)(5) that suggest that the annual RKA fees charged to Plan participants included any services that were unusual or above and beyond the standard RKA services provided by all national recordkeepers to mega plans with more than $500,000,000 in assets.

67.     By the start of, and during the entire Class Period, the level of fees that recordkeepers have been willing to accept for providing RKA has stabilized, and has not materially changed for mega plans, including the Prevea Plan. Reasonable recordkeeping fees paid in 2018 are representative of the reasonable fees during the entire Class Period. *See The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2020*, ICI Research Perspective, at 4 (June 2021).

68.     The investment options selected by plan fiduciaries often also have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

69.     The 2020 Plan Participant Fee Disclosure under ERISA Section 404(a)(5) explains in this regard that general administrative "fees are applied pro rata across some or

all investment options held in your account. However, the administrative fees allocable to an investment option may be paid, in whole or in part, from revenue (e.g., 12b-1 fees, administrative fees) that Transamerica Retirement Solutions or its affiliates receive based upon the plan's investment options."

70. Collecting a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund is known as "revenue sharing" or "indirect compensation." The Prevea Plan paid its Plan services providers both direct and indirect compensation during the Class Period.

71. The amount of compensation paid to plan service providers must be *reasonable* (not the cheapest or the average in the market).

72. Reasonable, in turn, depends on contextually understanding the market for such RKA services at the time that the recordkeeping contract is entered into. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).

## THE PLAN

73. During the entire Class Period, the Plan received RKA services from Transamerica.

74. The RKA fees were excessive relative to the level and quality of RKA fees received since the same level and quality of services are provided to all mega plans, like the Prevea Plan, and any minor variation with respect to the use of components of the standard offering 1) do not impact the RKA fee rates; and 2) are virtually always immaterial as it relates to the RKA fee rates and cannot reasonably explain the disparity between what the Plan paid and the market rate for the services received.

75. This is true regardless of the specific service codes listed by the plan on the Form 5500. *See* Droblyen, *supra*; Steinberg, *supra*; Barstein, *supra*.

76. These excessive Plan RKA fees led to lower net returns than the rates enjoyed by participants in comparable 401(k) plans.

77. During the Class Period, Defendants breached their duty of prudence to the Plan, to Plaintiffs, and all other Plan participants, by authorizing the Plan to pay objectively unreasonable fees for RKA.

78. Defendants' fiduciary mismanagement of the Plan, to the detriment of Plan participants and their beneficiaries, breached their fiduciary duties of prudence in violation of Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), and caused Plaintiff and members of the Class millions of dollars of harm to their Plan accounts.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES
## SELECTING & MONITORING RECORDKEEPERS

79. Prudent plan fiduciaries ensure they are paying only reasonable fees for RKA by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, and soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan. *See, e.g.,* U.S. DEPARTMENT OF LABOR, *Understanding Retirement Plan Fees and Expenses*, at 6, https://www.dol.gov/sites/dol-gov/files/EBSA/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (last visited Oct. 10, 2022) ("Once you have a clear idea of your requirements, you are ready to begin receiving estimates from prospective providers. Give all of them complete and identical information about your plan and the features you

want so that you can make a meaningful comparison. This information should include the number of plan participants and the amount of plan assets as of a specified date.")

80.     Prudent plan fiduciaries can easily receive a quote from other recordkeepers to determine if their current level of RKA fees is reasonable in light of the level and quality of RKA services. It is not a cumbersome or expensive process.

81.     It is the standard of care prevailing among industry experts to solicit competitive bids every three to five years. *See* CAPTRUST, *Understanding and Evaluating Retirement Plan Fees | Part One: A Holistic Approach*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-one-a-holistic-approach/ (stating "best practice is . . . a more formal recordkeeper search and selection process conducted approximately every three to five years. Recordkeeping and administrative fees should be evaluated and compared to plans of similar size and type that are receiving analogous services. While each plan is unique—making an apples-to-apples comparison imperfect—evaluating fees against similarly situated and sized plans provides a good reference point in helping to determine if plan fees are reasonable.")

82.     Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide the same (or better) level and qualities of services for a more competitive reasonable fee if necessary.

83.     A benchmarking survey alone is inadequate. Such surveys skew to higher "average prices," that favor inflated RKA fees. To receive a truly "reasonable" RKA fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a regular basis.

84.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014)

85.     First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

86.     Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

87.     Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

88.     Accordingly, the only way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of RKA services is to obtain competitive bids from other providers in the market.

## PLAN FIDUCIARIES DID NOT EFFECTIVELY MONITOR
## RKA FEES AND THE PLAN PAID UNREASONABLE RKA FEES

89.     A plan fiduciary must continuously monitor its RKA fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

90.     During the Class Period, Defendants failed to regularly monitor the Plan's Bundled RK&A fees paid to Transamerica.

91.     During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Transamerica, in order to avoid paying unreasonable Bundled RK&A fees.

92.     During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was ineffective given the objectively unreasonable Bundled RK&A fees it paid to Transamerica, and in light of the level and quality of RKA services it received.

93.     As set forth in the table below, from the years 2014 through 2022, based upon information provided by the Plan fiduciaries to Plan participants in the Participant Fee Disclosures under Section 404(a)(5), the Plan paid an effective average annual Bundled RKA fee of $165 per participant.

### Bundled Recordkeeping and Administration (Bundled RKA) Fees

|  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | *Average* |
|---|---|---|---|---|---|---|---|---|---|---|
| **Participants** | 1,702 | 1,856 | 1,927 | 2,058 | 2,184 | 2,397 | 2,552 | 2,646 | 2,646 | *2,219* |
| **Est. Bundled RKA Fees** | $298,428 | $306,972 | $296,223 | $352,919 | $337,515 | $415,819 | $396,829 | $447,919 | $447,919 | *$366,727* |
| **Est. Bundled RKA Per Participant** | $175 | $165 | $154 | $171 | $155 | $173 | $155 | $169 | $169 | *$165* |

94.     The table below illustrates the annual Bundled RKA fees paid by other comparable plans of similar and larger sizes with similar amounts of money under management, receiving a materially identical level and quality of RKA services (that all large or mega plans receive from recordkeepers), compared to the average annual Bundled RKA fees paid by the Plan (as identified in the table above).

**Comparable Plans' Bundled RKA Fees Based on Publicly Available Information from Participant Fee Disclosures or Financial Statements**

| Plan | Partici-pants | Assets | Bundled RKA Fee | Bun-dled RKA Fee /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Trinity Health 403(B) Retirement Savings Plan | 1,501 | $429,131,672 | $45,030 | $30 | Fidelity | White |
| Verso Retirement Savings Plan for Bargained Employees | 2,210 | $346,192,939 | $114,920 | $52 | Transamerica | White |
| **Prevea Plan Average Fee** | **2,219** | **$321,536,092** | **$366,727** | **$165** | **Transamerica** | **Red** |
| Doosan 401(K) Plan | 4,050 | $425,808,965 | $279,450 | $69 | Fidelity | White |
| Komatsu Mining Corp. Retirement Savings Plan | 5,235 | $812,598,602 | $256,515 | $49 | Fidelity | White |
| Mercedes-Benz USA, LLC Employees' Retirement Savings Plan | 5,659 | $702,141,779 | $294,268 | $52 | Voya | White |
| Aspirus, Inc. Code Section 403(B) Plan | 10,127 | $632,876,558 | $587,366 | $58 | Great-West | White |
| Consumers Energy Company Employees' Savings Plan | 11,320 | $2,478,855,430 | $475,440 | $42 | Fidelity | White |
| JBS 401(K) Savings Plan | 14,255 | $311,864,034 | $285,100 | $20 | Empower | White |
| Dollar General Corp 401(K) Savings and Retirement Plan | 16,125 | $356,929,661 | $516,000 | $32 | Voya | White |
| Team Health 401(k) | 17,237 | $1,280,891,222 | $430,925 | $25 | Schwab | White |

95. The comparator Plans serviced by other recordkeepers and charged less received the same level and quality of services. For instance, the Trinity Health 403(b) Retirement Savings Plan received general administrative services just like the Prevea Plan in the form of "recordkeeping, legal, accounting, trustee, and other administrative fees," according to its 2021 plan participant fee disclosures. The same or similar language exists in the ERISA Section 404(a)(5) disclosures of the other comparator Plans above.

96. From the years 2014 through 2022, the graph below illustrates the annual Bundled RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a materially identical level and quality of services, compared to the average Bundled RKA fees paid by the Plan (as identified in the table above), with the white data points representing Bundled RKA fees that recordkeepers offered to (and were accepted by) comparable Plans.



97.     From the years 2014 to 2022, the table and graph above illustrate that the Plan paid an effective average annual Bundled RKA fee of at least $165 per participant.

98.     The more participants a plan has, the lower the effective fee per participant that recordkeepers are willing to provide. The trend line in the graph represents a per participant fee rate for a given number of participants around which a plan fiduciary would expect to receive initial bids for the Bundled RKA services.

99.     When a plan fiduciary follows prudent practices as outlined by the Department of Labor and solicits bids from several recordkeepers in a competitive environment, some initial bids for the Bundled RKA services would be below the trend line and others would be above the trend line. Ultimately, a prudent plan fiduciary should be able to negotiate a Bundled RKA fee lower than the trend line such that the Bundled RKA fee would be proximate to the trend line.

100.    From the years 2014 through 2022, the table and graph above illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual Bundled RKA fee of around $52 per participant, if not lower.

101.    From the years 2014 through 2022, and as compared to other plans of similar sizes with similar amounts of money under management, had Defendants been acting with prudence, the Plan actually would have paid significantly less than an average of approximately $366,272 per year in RKA fees, which equated to an effective average of approximately $165 per participant per year.

102.    From the years 2014 through 2022, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a materially identical

level and quality of services, had Defendants been acting prudently, the Plan actually would have paid on average a reasonable effective annual market rate for Bundled RKA of approximately $115,388 per year in fees, which equates to approximately $52 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not agree to pay *more than three times* what they could otherwise pay for Bundled RKA services.

103. From the years 2014 through 2022, the Plan additionally cost its participants on average approximately $251,356 per year in Bundled RKA fees, which equates to on average approximately $113 per participant per year.

104. From the years 2014 to 2022, and because Defendants did not act prudently, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a materially identical level and quality of services, the Plan actually cost its participants a total minimum amount of approximately $2,262,206 in unreasonable and excessive Bundled RKA fees.

105. From the years 2014 to 2022, because Defendants did not act prudently, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a materially identical level and quality of services, the Plan actually cost its participants (when accounting for compounding percentages) a total, cumulative amount in excess of $3,886,801 in Bundled RKA fees.

106. Defendants could have received Bundled RKA services during the Class Period of the same level and quality from Transamerica or other recordkeepers that provide recordkeeping services to mega plans, like the Prevea Plan, because both the Plan 5500 forms,

Plan fee disclosures establish that the Plan received no services that were materially different than the services received by all the comparable plans in the chart above. There is no evidence, based on these Plan documents, that the plan received any additional services.

107.    Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, reasonable tradeoffs did not exist because all recordkeepers were providing a materially identical level or quality of services.

108.    Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing recordkeepers, Transamerica, and Defendants could have obtained the same level and quality of Bundled RK&A services for less from other service providers as the comparator plan's ERISA Section 404(a)(5) fee disclosures make clear.

109.    Plaintiffs paid these excessive Bundled RK&A fees in the form of direct and indirect compensation to the Plan and suffered injuries to his Plan account as a result of paying these excessive fees.

110.    Plaintiffs have participated in several 401(k) and 403(b) plans from other employers and there have been no material differences in the level or quality of services that they have received.

111.    Plaintiffs do not need to provide examples of similar plans receiving the <u>same</u> services in the <u>same</u> year where the primary drivers of price in large and mega plans are the number of accounts and whether the plan's fiduciaries solicited competitive

bids, rather than the marginal cost of recordkeeping for each participant. *See Coyer v. Univar Solutions USA Inc. et al.*, 2022 WL 4534791, at *5 (N.D. Ill. Sept. 28, 2022) (emphasis in original).

112. "The fact that each of the other similarly-sized plans were receiving <u>at least</u> the same services for less provides the kind of circumstantial evidence sufficient to create an inference of imprudence." *Id.* (citing *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 332 (3d Cir. 2019)) (emphasis in original).

113. During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the Bundled RKA fees it paid to Transamerica vis-à-vis the fees that other recordkeepers would charge, and would have accepted, for the same level and quality of services.

114. During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's Bundled RKA fees it paid to Transamerica, but Defendants either simply failed to do so, or did so ineffectively, given that it paid *more than three times* the Bundled RKA fees than it should have.

115. During the entirety of the Class Period, and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the Bundled RKA fees it paid to Transamerica, it would have realized that the Plan was compensating Transamerica

unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiffs and Plan participants, and therefore should have removed Transamerica as Plan recordkeeper.

116. The Plan RKA fees were also excessive relative to the RKA services received under the 2020 ERISA Section 404(a)(5) Fee Disclosures, since the quality and level of such services are standard for mega 401(k) plans like this Plan and are provided on an "all-you-can-eat-basis," based primarily on the number of participants a plan has. Any difference in RKA fees between comparable Plans is not explained by the level and quality of services each recordkeeper provides.

117. The market for Bundled RKA services for large or mega plans, like the Prevea Plan, is such that all national recordkeepers can provide all the required services that such plans might need. Any differences in the quality or scope of the services delivered are immaterial to the difference between what the Plan paid for Bundled RKA services and what the reasonable fair market fee was for identical services.

118. During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher Bundled RKA fees than they should have been and/or by failing to take effective remedial actions including removing Transamerica as the Plan recordkeeper, Defendants breached their fiduciary duty of prudence to Plaintiff and Plan participants, causing millions of dollars of harm to Plaintiffs and Class Member's retirement accounts.

## CLASS ACTION ALLEGATIONS

119. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

120. In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the Prevea Clinic, Inc. 401(k) and Retirement Plan beginning six (6) years before the commencement of this action and running through the date of judgment, excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan.

121. The Class includes over 2,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

122. There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

    a. Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

    b. Whether Defendants breached their fiduciary duties to the Plan;

    c. What are the losses to the Plan resulting from each breach of fiduciary duty; and

    d. What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

123. Plaintiffs' claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were Participants during the time period at issue and all Participants in the Plan were harmed by Defendants' misconduct.

124. Plaintiffs will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they were Participants in the Plan during the Class period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

125. Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

126. Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

127. Plaintiffs' attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

128. The claims brought by the Plaintiffs arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts, and thus internal exhaustion of these claims are not required.

### FIRST CLAIM FOR RELIEF
**Breach of Duty of Prudence of ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class, Against**
**Defendants – RKA Fees)**

129. Plaintiffs restate the above allegations as if fully set forth herein.

130. Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

131. 29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendants in their administration of the Plan.

132. Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges objectively reasonable RKA fees.

133. During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's RKA fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

134. During the Class Period, Defendants breached their fiduciary duty of prudence to Plan participants, including to Plaintiffs, by failing to: ensure that the Plan's RKA fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

135. During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeepers to make sure they were providing the RKA services at reasonable costs, given the highly competitive market surrounding RKA services and the significant bargaining power the Plan had to negotiate the best fees, and remove the recordkeepers if they provided RKA services at objectively unreasonable costs.

136. During the Class Period, Defendants breached their duty to Plan participants, including Plaintiff, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeepers critically or objectively in comparison to other recordkeeper options.

137. Through these actions and omissions, Defendants breached their fiduciary duty of prudence with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(B).

138. Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

139. As a result of Defendants' breach of fiduciary duty of prudence with respect to the Plan, the Plaintiffs and Plan participants suffered millions of dollars in objectively unreasonable and unnecessary monetary losses.

140. Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Prevea Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits

resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief as set forth in the Prayer for Relief.

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class, Against**
**Defendants – RKA Fees)**

141. Plaintiffs restate the above allegations as if fully set forth herein.

142. Defendants had the authority to appoint, oversee, and remove members or individuals responsible for Plan RKA fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

143. In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan RKA fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

144. Defendants had a duty to ensure that the individuals responsible for RKA services possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

145. The objectively unreasonable and excessive RKA fees paid by the Plan inferentially suggest that Defendants breached its duty to monitor by, among other things:

   a.   Failing to monitor and evaluate the performance of individuals responsible for Plan RKA fees or have a system in place for doing so, standing

idly by as the Plan suffered significant losses in the form of objectively unreasonably RKA expenses;

b.     Failing to monitor the process by which the Plan's recordkeeper, Transamerica, was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

c.     Failing to remove individuals responsible for Plan RKA fees whose performance was inadequate in that these individuals continued to pay the same RKA fees even though solicitation of competitive bids would have shown that maintaining Transamerica as the recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of the Plaintiff and Plan participants' retirement savings.

146. As the consequences of the foregoing breaches of the duty to monitor for RKA fees, the Plaintiffs and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

147. Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the Prevea Plan all loses caused by their failure to adequately monitor individuals responsible for Plan RKA fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration the Defendants are Plan fiduciaries and have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring

to the Plan all losses resulting from paying unreasonable RKA, managed account, and stable value fund fees, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An Order requiring Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(2) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Defendants as necessary to effectuate relief, and to prevent Defendants' unjust enrichment;

F.      An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.      An award of pre-judgment interest;

I.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.      Such other and further relief as the Court deems equitable and just.

Dated this 14th day of December, 2022

WALCHESKE & LUZI, LLC
Counsel for Plaintiff and Proposed Class

s/ *Paul M. Secunda*
James A. Walcheske, State Bar No. 1065635
Scott S. Luzi, State Bar No. 1067405
Paul M. Secunda, State Bar No. 1074127

WALCHESKE & LUZI, LLC
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
Fax: (262) 565-6469
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: sluzi@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com